UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NEW YORK AND PRESBYTERIAN
HOSPITAL,

                              Petitioner,

        -against-

NEW YORK STATE NURSES ASSOCIATION,

                              Respondent.

Case No. 1:24-cv-05648 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Petitioner New York and Presbyterian Hospital (the "Hospital") brings this petition to vacate an arbitration award entered in favor of Respondent New York State Nurses Association (the "Union"). Dkt. 4 ("Pet."). The Hospital filed a motion to vacate the award on July 26, 2024, Dkt. 5 ("Mot."), and the Union filed a cross-motion to confirm the award on August 30, 2024, Dkt. 19 ("Cross-Mot."). For the following reasons, the Hospital's petition to vacate is DENIED and the Union's cross-motion to confirm is GRANTED.

## BACKGROUND

The Hospital "is a New York not-for-profit corporation that operates an academic medical center with several campuses." Pet. ¶ 3. At the Columbia University Medical Center campus, the Hospital operates a Cardiothoracic Intensive Care Unit (the "CTICU"), which serves "as a specialized unit for handling patients who undergo open heart surgery, invasive procedures such as valve replacements and balloon pumps, and heart/lung transplant[s]." *Id.* ¶ 8. The Union "represents registered nurses at hospitals and other healthcare facilities in New York," Dkt. 20 ("Union Br.") at 4, and "is the collective bargaining representative of a bargaining unit of Registered Nurses (RNs) employed by the Hospital," Pet. ¶ 4.

### I.    The Agreement

Nearly six years ago, the Hospital and the Union entered into a three-year collective-bargaining agreement, Dkts. 14-2 to -3 (the "CBA"), which became effective on January 1, 2019, *id.* § 21.  The parties extended and modified the CBA by a Memorandum of Agreement, Dkt. 14-4 (the "MOA"), which became effective on January 1, 2023, *id.* at 6.  The Hospital states in its brief, without citation to evidence, that the MOA was subject to ratification by the Union's members, which occurred on January 7, 2023.  Dkt. 7 ("Hospital Br.") at 3 n.5, 23.

Under the CBA as modified by the MOA (together, the "Agreement"), the Hospital must maintain certain RN staffing levels in the CTICU as determined by an improvement grid, Dkt. 14-5 (the "Grid").  *See* MOA § 3.04(11), at 19 ("The [Hospital] agrees to maintain the number of nurses per unit per shift reflected in the improvement grids.").  The Grid sets staffing levels for each shift based on the number of admitted patients, *see* CBA at 117, and always requires two to four fewer RNs than patients, *see generally* Grid.  "For example, if the patient census is the maximum of 31, the grid provides for 27 nurses; if the patient census is 25, the grid provides for 22 nurses; and if the patient census is 13, the lowest number on the grid, it provides for 11 nurses."  Pet ¶ 17.

Under the Agreement, the Union must first raise Grid-related disputes with an ad hoc Allocation Committee.  CBA § 3.04(4); MOA § 3.04(5), at 15-17.  If the Allocation Committee is unable to resolve the dispute, either party may submit the matter to an arbitrator who "shall have the same remedial authority as an arbitrator" under the collective bargaining agreement.  MOA § 3.04(7), at 18; *see also* CBA § 3.04(6).  The Agreement further specifies that arbitration shall be "handled in accordance with the then-existing rules of the American Arbitration Association," CBA § 14.06, and that "[t]he arbitrator shall not have any power to add or subtract from or otherwise amend th[e] Agreement," *id.* § 14.07.

## II.    The Arbitration

In June 2023, the Union filed a grievance with the Allocation Committee, alleging that the Hospital had failed to comply with the Agreement's minimum staffing requirements for the CTICU since January 2023 as set out by the Grid.  Pet. ¶¶ 21, 23.  In November 2023, the Union demanded arbitration.  *Id.* ¶ 21.

On February 9 and March 20, 2024, the parties participated in a Zoom hearing before Bonnie Siber Weinstock (the "Arbitrator").  *Id.* ¶ 22; Dkt. 14-1 ("Award") at 1.  At the first hearing date, "the parties were unable to agree upon the issue for arbitration, but they consented to allow the Arbitrator to frame the issue."  Award at 2.  The Arbitrator framed the issue for arbitration to be: (1) "Did the Employer violate the collective bargaining agreement with respect to the staffing on the CTICU?"; and (2) "If so, what shall be the remedy?"  *Id.*

On the first question, the Union asserted that the Hospital violated the agreement by "understaff[ing] its CTICU below the levels required by the . . . grid, on an almost-daily basis."  Dkt. 14-27 ("Union Arb. Br.") at 1.  The Hospital did not dispute that staffing had fallen below Grid levels, but it "maintain[ed] that it did not violate the Agreement."  Award at 9.  The Hospital reasoned, among other things, that it "expeditiously recruited and hired nurses to fill vacant budgeted RN positions pursuant to" the Agreement; that the Agreement required no "specific staffing ratio"; that the Agreement afforded the Hospital "discretion and flexibility . . . to staff the unit appropriately and safely at all times"; and that there was no "pattern" of staffing violations.  Dkt. 14-26 ("Hosp. Arb. Br.") at 2.

On the second question, the Union argued that the Hospital's alleged violation of the Agreement increased the workload of RNs on understaffed shifts and requested a "make-whole financial remedy" to compensate them for "all the extra labor [they] expended."  Union Arb. Br. at 8; *see id.* at 6.  They further requested that the Arbitrator order the Hospital "to hire and

maintain an adequate number of nurses to prevent future staffing violations in the CTICU and to cease and desist from understaffing the unit." *Id.* The Hospital countered that the "requested make whole remedy is precluded by the terms of the Parties' Agreement and New York law and is an inappropriate attempt to obtain a punitive remedy that was not agreed to in the collective bargaining agreement with the Hospital." Hosp. Arb. Br. at 3.

## III.   The Award

On May 22, 2024, the Arbitrator issued an Opinion and Award sustaining the Union's grievance. Pet. ¶ 27; Award at 19. The Arbitrator first determined that the Agreement clearly and unambiguously required the Hospital "to maintain the number of nurses per unit per shift reflected in the improvement grids." Award at 7 (quoting MOA § 3.04(11), at 19) (citing CBA § 3.04(10)); *see id.* at 8 ("Simply put, the Hospital and Union agreed to the required staffing on the unit based on patient census."). Accordingly, she found that the Hospital "violated the Agreement" because it "did not staff the [CTICU] in accordance with the grid." *Id.* at 8. The Arbitrator further reasoned that the "flexibility" afforded by the Agreement did not absolve the Hospital of its responsibility to fully staff the CTICU immediately because that provision pertained only to assigning patients to nurses. *Id.* at 8-9; *see* MOA § 3.04(11), at 19-20; CBA § 3.04(10).

Having found a violation, the Arbitrator proceeded to conclude that the Agreement empowered her to award a "monetary remedy when warranted." *Id.* at 12. She observed that the MOA acknowledged her "remedial authority" in stating that the arbitrators that heard disputes unresolved by the Allocation Committee "shall have the same remedial authority as an arbitrator under the Agreement." *Id.* at 11 (quoting MOA § 3.04(7), at 18). She then opined that "[i]t is axiomatic that an arbitrator's authority to hear and decide a grievance includes the authority to remedy any contract violation found, subject to any limitations placed on the arbitrator under the

empowering collective bargaining agreement." *Id.* She observed that a remedy-limiting provision from the parties' 2019 CBA — which specified that the "sole remedy the arbitrator is empowered to award is a directive to the Hospital to adhere to the established staffing guidelines" — was removed from the operative Agreement, *id.*, and that the only remaining limitation was that she could not "add to or subtract from or otherwise amend [the] Agreement," *id.* at 11-12 (quoting CBA § 14.07). Because she determined that the Agreement contained no other limitation on her authority, the Arbitrator concluded that she could issue a monetary remedy. *Id.* at 12. The Arbitrator further rejected the Hospital's argument that "a monetary remedy to nurses working on an understaffed shift" was punitive. *Id.* Instead, she reasoned that such a remedy was compensatory because it was "designed to compensate the nurses for working under the adverse conditions of caring for more patients than would usually be assigned based purely on the fact that not enough nurses were working on the shift." *Id.*

In crafting her monetary remedy, the Arbitrator found that "a monetary remedy [was] appropriate to remunerate nurses for working under the adverse conditions of an understaffed shift," *id.* at 13, but only for shifts that were understaffed by three or more nurses, *id.* at 16; *see also id.* at 17 ("[T]he Arbitrator does not award a remedy on the shifts that were understaffed by one or two nurses, because it appears to the Arbitrator that the Charge Nurse could be given an assignment and that would alleviate much of the burden on the rest of the shift."). To calculate the final award, the Arbitrator "divide[d] among the nurses" who worked an understaffed shift "the amount of money the Hospital would have paid to the number of extra nurses [less two] needed to properly staff the shift." *Id.* at 17; *see also id.* App. A (outlining award of approximately $275,000 broken down by the understaffed shifts). The Arbitrator did not award an offset to the Hospital based on the "good faith" efforts it allegedly expended on recruitment,

retention, and temporary staffing because she considered "the monetary remedy [to be] compensation to the nurses for the adverse conditions under which they worked, and not a penalty to the Employer." *Id.* at 18.  She further directed the Hospital "to continue its efforts to recruit and retain sufficient nurses to staff the CTICU in accordance with the grid." *Id.*

## IV.    Motions to Vacate and Confirm

On July 26, 2024, the Hospital filed a Petition and moved to vacate the Award.  *See* Pet.; Mot.  The Hospital filed a brief in support of its motion to vacate.  *See* Hospital Br.  On August 30, 2024, the Union filed a cross-motion to confirm the Award, *see* Cross-Mot., and a consolidated brief in support of its motion to confirm the Award and in opposition to the Hospital's motion to vacate the Award, *see* Union Br.  On September 20, 2024, the Hospital filed its consolidated brief in opposition to the Union's motion to confirm the Award and its reply in further support of its motion to vacate the Award.  Dkt. 21 ("Hospital Opp.").  Finally, on October 4, 2024, the Union filed its reply brief in further support of its motion to confirm the Award.  Dkt. 22 ("Union Reply").

## DISCUSSION

## V.    Legal Standard

"[A] federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential — indeed, among the most deferential in the law."  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 532 (2d Cir. 2016).  For this reason, a reviewing court's "obligation is limited to determining whether the arbitration proceedings and award met the minimum legal standards established by the Labor Management Relations Act" (the "LMRA").  *Id.*; *see* 29 U.S.C. § 141 *et seq.*  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of h[er] authority," a court may not overturn her decision even if it "is convinced [s]he committed serious error."

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). A reviewing court may not reject an arbitrator's findings of fact "simply because it disagrees with them." *Id.* Nor may a court "reject an award on the ground that the arbitrator misread the contract," so long as the arbitrator does "not ignore [its] plain language." *Id.* "So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that [s]he finds, courts have no authority to disagree with h[er] honest judgment in that respect." *Id.* At bottom, "where an arbitrator explains h[er] conclusions 'in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.'" *Int'l Bhd. of Elec. Workers, Loc. 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 717 (2d Cir. 1998) (quoting *Saint Mary Home, Inc. v. Serv. Emps. Int'l Union, Dist. 1199*, 116 F.3d 41, 44 (2d Cir. 1997)); *accord Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council*, 729 F. App'x 33, 37-38 (2d Cir. 2018) (summary order).

A court may vacate a labor arbitration award if it "contradicts an express and unambiguous term of the contract or . . . so far departs from the terms of the agreement that it is not even arguably derived from the contract." *N.Y.C. & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus., Inc.*, 826 F.3d 611, 618 (2d Cir. 2016) (omission in original) (quoting *United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*, 804 F.3d 270, 275 (2d Cir. 2015)). In other words, vacatur is proper if the award "does not 'draw[] its essence from the collective bargaining agreement' but reflects instead 'the arbitrator's own brand of industrial justice.'" *Id.* (alteration in original) (quoting *Nat'l Football League*, 820 F.3d at 537).

A court may also vacate an arbitration award on public policy grounds, although this authority is "is narrowly circumscribed 'to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Saint Mary Home*, 116 F.3d at 45 (omission in original) (quoting *Misco*, 484 U.S. at 43); *see also United Bhd. of Carpenters & Joiners*, 826 F.3d at 618 ("[T]he public policy ground for vacatur is 'extremely limited.'" (quoting *Loc. 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999))). An award may be vacated if the remedy imposed by the arbitrator "can be fairly and unequivocally shown to violate a well-established public policy." *Niagara Mohawk Power Corp.*, 143 F.3d at 717. This exception "is designed to be narrow so as to limit potentially intrusive judicial review of arbitration under the guise of 'public policy.'" *Saint Mary Home*, 116 F.3d at 45-46 (quoting *Am. Postal Workers Union v. U.S. Postal Serv.*, 789 F.2d 1, 8 (D.C. Cir. 1986)). Accordingly, "[t]he party seeking to prevent enforcement of the award" on this ground "must 'clearly show[]' a violation of public policy." *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 825 (2d Cir. 1997) (quoting *Misco*, 484 U.S. at 43).

The Hospital urges the Court to vacate the Award for three reasons. First, the Award violates well-defined public policy against punitive awards. Hospital Br. at 10-17. Second, the Arbitrator exceeded her authority in imposing monetary remedies. *Id.* at 18-21. And, third, the Arbitrator irrationally found violations of the Agreement where none existed. *Id.* at 21-24. The Union disagrees and argues that "these arguments flout the narrow standard of review applicable here, misconstrue Arbitrator Weinstock's detailed factual findings and cogent reasoning in

support of her decision, and ultimately provide no basis for vacatur." Union Br. at 10. The Court addresses each of the Hospital's proffered grounds for vacatur in turn.

### A. Public Policy

The Hospital first argues that the Award is punitive, which would violate public policy under both Federal labor law and New York state law. Hospital Br. at 11 ("It is well established that under both sources of law that arbitration awards cannot be punitive."). The Union responds that even if there were a well-defined public policy against punitive arbitration awards, the monetary remedy here does not clearly and unequivocally violate such a policy because the Award was compensatory and not punitive. Union Br. at 11.

The Hospital contends that the Award is punitive because it "does not strictly correspond to losses suffered by employees." Hospital Br. at 14 (capitalization omitted). It reasons that the Award puts the CTICU RNs in a better economic position — "much better off" — than they would have been had the unit been fully staffed. *Id.* at 16 ("The Award bestows upon the nurses something that they could not get if the staffing grid is met, even if they had to care for more than one patient in the CTICU during their shift. That is precisely the type of windfall prohibited under 'make whole' compensatory remedies." (footnote omitted)); *see id.* at 14-16. Rather than "compensate for a loss," *id.* at 15, the Hospital argues that the Award more closely resembles a disgorgement remedy because it compensates nurses "based on the Hospital's alleged 'savings' in having fewer nurses assigned to the CTICU on a given shift," *id.* at 16. Lastly, the Hospital argues that the Award is punitive because "the purpose of the monetary remedy involves coercing compliance" with the Agreement. *Id.* at 17.

The Court finds that, assuming there is a well-defined public policy against punitive arbitration awards, the Hospital has not "clearly shown" that the Award is punitive. *See Misco*,

484 U.S. at 43 (violation of public policy "must be clearly shown if an award is not to be enforced"). "Compensatory damages are just that; they compensate the injured victim for injuries actually endured." *Virgilio v. City of New York*, 407 F.3d 105, 116 (2d Cir. 2005). Not only did the Arbitrator expressly address the question of whether awarding monetary damages would be punitive, holding that "a monetary remedy to nurses working on an understaffed shift is not punitive," Award at 12, but she also made specific findings about the nurses' injuries due to the understaffing and tailored the monetary remedy to compensate for that harm, *id.* at 12-18. *Cf. John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir. 1980) (upholding arbitral award because there was "no basis [from the record] to infer that the [Award] bore no relationship to the actual damage suffered" and "no indication that arbitrator intended the award to be punitive"). More specifically, the Award recognized that only those nurses who "work[ed] under the adverse conditions of an understaffed shift" — due to the Hospital's violation of the Agreement — were entitled to compensation. Award at 12. The Arbitrator further tailored the Award by declining to provide a remedy for shifts understaffed by only one or two nurses, finding that those conditions did "not produce a burdensome work environment." *Id.* at 14; *see id.* at 13-16 (explaining this tailoring with examples); *see also N. Colonie Cent. Sch. Dist. v. N. Colonie Teachers' Ass'n*, 401 N.Y.S.2d 874, 875 (App. Div. 1978) (affirming arbitrator's award of compensatory damages for understaffing violation of the CBA in the amount of the salary of unhired teachers to be divided among the teachers who had to perform extra work), *aff'd*, 389 N.E.2d 142 (N.Y. 1979). In sum, the Court finds that the Award is not clearly punitive because the Arbitrator made specific factual findings regarding the RNs' harms and tailored a monetary remedy to compensate for those harms.

Unlike compensatory damages, "[p]unitive damages are invoked to punish egregious, reprehensible behavior," *Virgilio*, 407 F.3d at 116, and "do not seek to make the injured victim whole," *id.* at 117.  This does not resemble the Award.  The Arbitrator never purported to punish the Hospital for its behavior and explicitly framed her award as a "make whole remedy."  Award at 3.  She acknowledged the Hospital's "commendable" and "good faith efforts to recruit new staff, and to supplement staffing with travelers, per diem and overtime nurses."  Award at 18.  The Arbitrator declined to offset the Award "based on the[se] significant efforts," *id.* at 17, because the Award served as "compensation to the nurses for the adverse conditions under which they worked, and not [as] a penalty" to the Hospital, *id.* at 18.

The Court does not find persuasive the Hospital's argument that the Award did not compensate for actual loss or harm to the nurses because they received "their full contractually guaranteed wage" for the understaffed shifts.  Hospital Br. at 15.  The Arbitrator's Award was not structured to compensate for deficient wages but instead to compensate the nurses for "working under the adverse conditions of an understaffed shift."  Award at 12-13.

The fact that the payments ordered reflect the amounts that the Hospital would have paid to employ the required staff, less two per shift, does not render the Award punitive or noncompensatory.  The Court will not second-guess the Arbitrator's judgment, based on a particularized assessment of burden when understaffing reached a certain level, that this was a reasonable estimate of the monetary value of the additional burden placed on the nurses during the understaffed shifts.  *See Niagara Mohawk*, 196 F.3d at 125 (court's authority to determine whether an award would violate public policy "does not afford courts 'authority to disagree with [the arbitrator's] honest judgment' about the proper remedy to be awarded in a given case" (alteration in original)).  The monetary remedy also does not constitute a windfall to the nurses

because it is paid only to the nurses who worked the understaffed shifts, varying based on the

severity of the understaffing, which further underscores the compensatory nature of the Award.

The Court cannot say that this compensatory remedy clearly constitutes a punitive award or that

the Arbitrator did not have a barely colorable justification for the Award.  Therefore, the Court

declines to vacate the Award on that basis.

### B.  Arbitrator's Authority

The Hospital next argues that the Arbitrator "exceeded her authority under the agreement

by awarding any form of damages to the Union for the alleged contractual violations."  Hospital

Br. at 18 (capitalization omitted) ("This flaw in the Award provides an independent basis to

vacate . . . .").  The Hospital points to the CBA provision specifying that the Arbitrator "shall not

have any power to add to or subtract from or otherwise amend this Agreement," CBA § 14.07,

and argues that the Arbitrator exceeded this power by effectively "chang[ing] the wage rate of

nurses in the CTICU based on their perceived increase in workload" despite "neither the CBA

nor the MOA differentiat[ing] pay based on actual or perceived workload," Hospital Br. at 18;

*see also id.* at 19 (calling the Award a "special premium wage").  The Union counters that the

Agreement "does not expressly limit" the Arbitrator's remedial authority, which afforded her

discretion to fashion an appropriate remedy for a violation of the Agreement.  Union Br. at 18.

The Court finds that the Arbitrator did not exceed her authority by imposing a monetary

award.  "Under our heightened standard of deference, vacatur . . . is appropriate only if the

arbitral award contradicts an express and unambiguous term of the contract or if the award so far

departs from the terms of the agreement that it is not even arguably derived from the contract."

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002) (Sotomayor, J.); *see*

*also Misco*, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying

the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). "In accordance with this deferential approach, the Supreme Court has unambiguously stated that a reviewing court is bound by both the arbitrator's factual findings and h[er] judgment regarding remedies." *Niagara Mohawk Power Corp.*, 143 F.3d at 715 (citing *Misco*, 484 U.S. at 37-38); *Hygrade Operators, Inc. v. Loc. 333, United Marine Div.*, 945 F.2d 18, 23-24 (2d Cir. 1991) (courts must "defer to the 'honest judgment' of an authorized arbitrator's determination of a remedy"). Here, the MOA acknowledges that the Arbitrator has "remedial authority." *See* MOA § 3.04(7), at 18. The Arbitrator was justified in finding that the MOA does not contain limitations on that remedial authority in contrast to the parties' earlier 2019 CBA that stated that the "sole remedy the arbitrator is empowered to award is a directive to the Hospital to adhere to the established staffing guidelines." Award at 11 (emphasis omitted); *see id.* at 11-12. *See generally Wackenhut Corp. v. Amalgamated Loc. 515*, 126 F.3d 29, 32 (2d Cir. 1997) ("The contractual theory of arbitration . . . requires a reviewing court to affirm an award it views as incorrect — even very incorrect — so long as the decision is plausibly grounded in the parties' agreement.").

The standard MOA provision forbidding the Arbitrator from "add[ing] to or subtract[ing] from or otherwise amend[ing]" the Agreement does not undermine the Arbitrator's authority to impose a monetary award here. *See* CBA § 14.07. The Arbitrator did not purport to "amend" the Agreement by awarding the RNs a "special premium wage" as the Hospital asserts. Hospital Br. at 19. Rather, she awarded a discrete compensatory monetary award to nurses who had been damaged by the burdens imposed by the Hospital's understaffing violations that she found. The Hospital alleges that the 2019 remedial-authority limitation was removed from the 2023 Agreement "to clear the way for the Union to negotiate for a special remedial provision that

would . . . authorize what the Arbitrator did," and which "[t]wo other hospitals agreed to include" in other CBAs.  *Id.* at 20.  In the absence of such a provision, the Hospital argues that the Agreement authorized only certain implied arbitral remedies, such as "[s]ettlement of the issue about how to interpret a disputed term," *id.*, or "order[ing] a party to cease and desist violations of the CBA," *id.* at 21.  But the Arbitrator correctly looked to the Agreement that was presently before her and here, "the CBA does not itemize a single remedy available to an arbitrator resolving a dispute under the Agreement."  *Allied Int'l Union v. Tristar Patrol Servs., Inc.*, No. 06-cv-15515 (LAP), 2007 WL 2845227, at *4 (S.D.N.Y. Sept. 26, 2007).  "In the face of such silence, the deference described by the Supreme Court . . . to permit the arbitrator to fashion the most appropriate remedy under the circumstances, is warranted."  *Id.* (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)); *accord Wildlife Conservation Soc'y v. Loc. 1501, D.C. 37*, No. 11-cv-6953 (LAK) (JCF), 2012 WL 13389073, at *9 (S.D.N.Y. Mar. 22, 2012), *report and recommendation adopted*, 2012 WL 13389126 (S.D.N.Y. Apr. 10, 2012); *see Enter. Wheel*, 363 U.S. at 597 ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem.  This is especially true when it comes to formulating remedies.  There the need is for flexibility in meeting a wide variety of situations.  The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.").

Accordingly, the Court will not grant vacatur on the basis that the Arbitrator exceeded the scope of her authority under the Agreement.

## C. Irrationality

Lastly, the Hospital argues that the Award should be vacated on the ground that the "Arbitrator acted irrationally and contrary to the Agreement in certain findings on purported violations of the Agreement."  Hospital Br. at 21.  The Hospital asserts that these certain "limited aspects of the Arbitrator's findings become subject to judicial review to the extent they are so irrational that they no longer draw their essence" from the Agreement."  *Id.* at 22 (citing *Misco*, 484 U.S. at 38).  The Hospital points to two ways in which the "Arbitrator strayed from the . . . essence" of the Agreement:  "First, she decided that nurses who were in orientation (orientees) should not be counted toward grid standard compliance by the Hospital."  *Id.*  "Second, she did not allow for a reasonable time within which the Hospital reasonably could come into compliance with the new staffing grid numbers in 2023."  *Id.*  On this second point, the Hospital raises two sub-issues: (i) that the "the Arbitrator did not allow for any period for the Hospital to ramp up," and (ii) that the Arbitrator found violations of the MOA dating back to January 1, 2023, the effective date of the MOA, instead of January 7, 2023, the date it was ratified by the Union.  *Id.* at 23.

As a threshold matter, this Court has previously found that "complete irrationality" is not a recognized ground for vacatur of an arbitration award in the Second Circuit, at least in the context of the Federal Arbitration Act ("FAA").  *See Shenzhen Zongheng Domain Network Co., Ltd. v. Amazon.com Servs. LLC*, No. 23-cv-03334 (JLR), 2023 WL 7327140, at *6 (S.D.N.Y. Nov. 7, 2023).  While this case was brought under the LMRA, "the stringent standard for vacating an arbitration award is materially the same" under the FAA and the LMRA.  *Am. Postal Workers Union v. U.S. Postal Serv.*, 754 F.3d 109, 112 n.4 (2d Cir. 2014); *see also Trs. of Empire State Carpenters Annuity, Apprenticeship, Lab.-Mgmt. Co-op., Pension & Welfare Funds*

*v. Thalle/Transit Const. Joint Venture*, No. 12-cv-05661 (JFB), 2014 WL 3529728, at *5 n.2 (E.D.N.Y. July 15, 2014) ("[T]he Court doubts that it could vacate the arbitration award at issue here [under the LMRA] solely on grounds of irrationality."). In any event, the Hospital suggests — and the Court agrees — that its irrationality argument should be assessed in terms of whether the Award "draw[s] its essence from the collective bargaining agreement." *United Bhd. of Carpenters & Joiners*, 826 F.3d at 618 (quoting *Nat'l Football League*, 820 F.3d at 536).

On the first issue, the Court finds that the Arbitrator provided at least a barely colorable justification for omitting orientees from the staffing count in assessing whether there was a Grid violation. She reasoned: "In the data provided by the Hospital . . . the orientees were not counted in the staffing, nor should they have been since they did not receive their own assignments; rather, they were working with preceptors who should have been included in the staffing numbers." Award at 13 n.6. Excluding orientees on this basis does not conflict with the essence of the Agreement. The Agreement outlines several "factors" to "be considered in reviewing staffing grids," including "patient needs and acuity," the "experience and skill set of the individual nurses," and "competency with . . . clinical interventions." MOA at 14. The Arbitrator's decision to exclude orientees from the staffing count aligns with these factors: orientees do not have the same experience, skill, and clinical competencies to address the needs of CTICU patients as fully trained RNs, and because orientees do not have their own assignments, they would not lessen the workload of the rest of the RNs (including the preceptors) on an understaffed shift. While the Hospital may not agree with this factual assessment, "a reviewing court is bound by . . . the arbitrator's factual findings." *Niagara Mohawk Power Corp.*, 143 F.3d at 715.

On the second issue, the Court finds that the Arbitrator had at least a barely colorable justification for requiring the Hospital to "maintain the number of nurses per unit per shift reflected in the improvement grids" starting on January 1, 2023.  CBA § 3.04(10).  The Grid outlines staffing levels to be followed as of January 1, and the Agreement contains no express language granting the hospital a "grace period" to come into compliance.  As the Arbitrator found, the flexibility that was referenced in the Agreement, *see* CBA § 3.04(10), MOA § 3.04(11), at 19-20, dealt with how patients are assigned to nurses, and did not permit flexibility as to when the Hospital was required to comply with the staffing Grid.  Award at 8-9.

Finally, the Hospital's argument that it was only obligated to comply with the Grid staffing obligations after the MOA was ratified on January 7, 2023, and not as of January 1, 2023, was forfeited because it failed to raise this issue at arbitration.  *See generally Europcar Italia, S.p.A. v. Maiellano Tours, Inc*., 156 F.3d 310, 315 (2d Cir. 1998) (finding that defendant forfeited an issue by "fail[ing] to raise [it] . . . to the arbitrators"); *Chem. Overseas Holdings, Inc. v. Republica Oriental Del Uru.*, 371 F. Supp. 2d 400, 401 (S.D.N.Y. 2005) ("Permitting parties to keep silent during arbitration and raise arguments in enforcement proceedings would undermine the purpose of arbitration which is to provide a fast and inexpensive method for the resolution of . . . disputes." (omission in original) (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Loc. 731*, 990 F.2d 957, 960-61 (7th Cir. 1993)), *aff'd*, 246 F. App'x 6 (2d Cir. 2006) (summary order).  The Court rejects the Hospital's attempt to argue that it raised this ratification argument in its post-hearing brief when it stated that the agreement "was reached on January 7, 2023," because that statement was made in the context of the Hospital's duty to hire nurses for vacant positions, not its duty to maintain the contract's staffing ratios.  *See* Hosp. Arb. Br. at 16.  Moreover, no argument was presented to the Arbitrator as to whether the effective date of

January 1 or the ratification date of January 7 was the operative date for purposes of the Hospital's obligations under the staffing Grid. *Cf.* MOA at 6 ("This Agreement, except as otherwise stated, will be effective 12:01 a.m. January 1, 2023 . . . ."); 2 Williston on Contracts § 6:79 (4th ed.) ("[W]here the parties themselves agree that a contract between them should be given effect as of a specified date . . . there is no sound reason why that agreement should not be given effect."). In any event, the Arbitrator interpreted the Agreement to determine that the Hospital's staffing obligations began on January 1, and "[c]ourts are not empowered to reexamine the merits of an arbitration award, even though the parties to the agreement may argue that the award arises out of a misinterpretation of the contract." *Niagara Mohawk*, 143 F.3d at 714; *see also Loc. One Amalgamated Lithographers of Am. v. Stearns & Beale, Inc.*, 812 F.2d 763, 768 (2d Cir. 1987) ("Where the parties have provided for interpretation of their collective bargaining agreement by arbitration, the courts will defer to the arbitrator's interpretation. . . . Mere disagreement with the construction of the contract is not enough to disturb the award." (citing *Enter. Wheel*, 363 U.S. at 596, 599)).

For all of these reasons, the Award cannot be said to conflict with any express terms or the "essence" of the Agreement to an extent that would require vacatur under the exceedingly high standard discussed above. *See Nat'l Football League*, 820 F.3d at 536 ("Because it is the arbitrator's view of the facts and the meaning of the contract for which the parties bargained, courts are not permitted to substitute their own.").

* * *

Having concluded that Petitioners have not shown any ground for vacating the arbitration award, the Court denies the petition.

**VI.    Cross-Motion to Confirm the Arbitration Award**

"Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter." *L'Objet, LLC v. Limited*, No. 11-cv-03856 (LBS), 2011 WL 4528297, at *3 (S.D.N.Y. Sept. 29, 2011); *see also Elwell v. Raymond James Fin. Servs., Inc.*, 686 F. Supp. 3d 281, 294 (S.D.N.Y. 2023) (same).  As explained above, Petitioners have not provided any valid reason to vacate, modify, or correct the arbitration award.  As a result, the Union's cross-motion to confirm the arbitration award is granted.  *See Shenzhen Zongheng*, 2023 WL 7327140, at *7 (granting cross-motion to confirm arbitration award after denying petition to vacate); *First Cap. Real Est. Invs., L.L.C. v. SDDCO Brokerage Advisors, LLC*, 355 F. Supp. 3d 188, 196 (S.D.N.Y. 2019) (same).

## CONCLUSION

For the reasons stated above, the Hospital's petition and motion to vacate the May 22, 2024 arbitration award is DENIED and the Union's cross-motion to confirm the arbitration award is GRANTED.  The Clerk of Court is directed to terminate the motions at Dkts. 5 and 19, and to close the case.

Dated:  December 13, 2024
        New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge